[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11007
_____

D.C. Docket No. 1:10-cv-03132-SCJ

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellant
Cross-Appellee,

CONTRICE TRAVIS,

Intervenor-Appellant
Cross-Appellee,

versus

EXEL, INC.,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(March 16, 2018)

Before TJOFLAT and JILL PRYOR, Circuit Judges, and MOODY,[*] District Judge.

JILL PRYOR, Circuit Judge:

A jury awarded the Equal Employment Opportunity Commission (the "EEOC") and Contrice Travis back pay, compensatory damages, and punitive damages after finding that Travis's employer, Exel, Inc., discriminated against her because of her sex. The discrimination occurred when Dave Harris, Travis's supervisor, denied her a promotion in favor of Michael Pooler, a male employee. After the verdict, Exel filed a renewed motion for judgment as a matter of law. The district court denied Exel's motion as to liability, but granted it as to the jury's punitive damages award. Travis and the EEOC now appeal the vacatur of the jury's punitive damages award, and Exel cross-appeals the denial of its motion as to liability. After careful review, we affirm.

## I.    BACKGROUND

Travis sought a promotion to a position vacated by her direct supervisor, Kenny Teal, when Harris promoted Teal to Operations Manager. When she learned of Teal's promotion, Travis told Harris that she wished to be considered for Teal's vacated position. But instead of promoting Travis, Harris selected Pooler to fill the vacated position, purportedly through the application of Exel's

---

[*] The Honorable James S. Moody, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

2

priority transfer practice ("PTP"), which Exel implemented as a means of transferring employees to vacant positions instead of laying them off.

By his own admission, Harris could have promoted Travis even though he was presented with a PTP candidate. Harris testified at trial that the PTP imposed no mandatory hiring and that he retained discretion in deciding whether to hire Pooler. Harris also acknowledged that he could have exercised his discretion by promoting Travis and moving Pooler into Travis's vacated position. The evidence at trial showed the feasibility of this option: several witnesses testified that Travis was well qualified for the promotion. Teal and another supervisor testified that Travis was an exceptional employee who could have easily met the job's demands. Pooler himself testified that Travis was more qualified for the job than he was. But despite Travis's expressed interest and qualifications—and Harris's discretion to promote her—Harris told her that he "was never going to" promote her to a supervisor position. Doc. 165 at 130.[1]

Harris also had a history of bias against women. Multiple witnesses testified at trial that Harris treated female employees differently than male employees. He spoke to female employees less often, acted standoffish toward them, and asked other supervisors to manage them so that he did not have to do so. But most importantly, trial testimony connected evidence of Harris's general bias against

---

[1] All citations in the form "Doc. #" refer to the district court docket entries.

women with his specific decision not to promote Travis. Teal testified that after he was promoted he recommended Travis for his vacated position, and Harris's response was that he "would not put a woman in a management position." Doc. 166 at 16.

## II.    STANDARD OF REVIEW

We review a district court's ruling on a renewed motion for judgment as a matter of law *de novo* and apply the same standards as the district court. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). Judgment as a matter of law is appropriate "only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1275 (11th Cir. 2008) (internal quotation marks omitted). "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted). "We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence." *Lambert v. Fulton Cty.*, 253 F.3d 588, 594 (11th Cir. 2001).

## III.    DISCUSSION

**A.    Travis's Evidence Was Sufficient for a Reasonable Jury to Find that She Suffered Discrimination Because of Her Sex.**

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment,

because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff can prove sex discrimination under Title VII by showing that her sex "was a motivating factor for any employment practice, even though other factors also motivated the practice."  *Id.* § 2000e-2(m).  At trial, Exel countered Travis's claim that she was denied the promotion based on her sex by offering a legitimate, nondiscriminatory reason for Harris's hiring decision:  a routine application of the PTP resulted in Pooler's selection over Travis.  To prove her Title VII claim, then, Travis had to show that Exel's proffered reason was pretextual "either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

We may overturn the jury's verdict only if we conclude that no reasonable jury could have found that Harris's hiring decision was motivated by discrimination based on Travis's sex rather than by application of the PTP.  We cannot so conclude for two reasons.  First, the jury heard evidence that Harris could have promoted Travis despite being presented with a PTP candidate.  Franklin Hudson, who worked in Exel's Human Resources Department, testified that General Managers like Harris controlled their own hiring and could veto PTP candidates if they wished.  Likewise, Harris admitted that he made the ultimate decision whether to hire Pooler.  He also admitted that he could have exercised his

5

hiring discretion by promoting Travis and moving Pooler into Travis's vacated position. Our dissenting colleague argues that this would have been a demotion for Pooler, but that is beside the point: the PTP did not require Harris to hire Pooler to fill Teal's vacated position. If the PTP did not require Harris to hire Pooler, then it is for the jury to decide what motivated Harris's decision. Because two different witnesses—including the decisionmaker himself—testified that the PTP imposed no mandatory hiring, the jury reasonably could have concluded that Harris had the discretion to promote Travis even though he was presented with a PTP candidate.

Indeed, the jury also heard evidence supporting the inference that Harris could have promoted Travis to Teal's vacated position without going through the PTP process at all. Both Travis and Harris testified that when Teal was promoted, Travis approached Harris seeking promotion to Teal's vacated position. Even though the evidence failed to show exactly when this conversation took place relative to when Exel's Human Resources Department first presented Pooler to Harris as a PTP candidate, the jury reasonably could have inferred that it took place beforehand. Harris testified that when Travis expressed interest in the promotion, he told her that he "was going to" post the open position, but had not done so yet. The Human Resources Department could not have referred Pooler as a PTP candidate until after the opening was posted, or at least submitted to Human Resources for posting, according to trial testimony. This evidence supports the

6

reasonable inference that Harris knew about Travis's interest before he ever received Pooler as a PTP candidate or even learned that he would receive a PTP candidate at all.  And the evidence that promotions often happened informally at Exel—for example, Harris received his own position through an informal promotion process—supported a finding that Harris could have promoted Travis when she approached him about Teal's vacated position, without going through the PTP process at all.

Second, the evidence showed that Harris harbored a bias against women. Travis testified that Harris "limited his contact with pretty much all the females in [the] office" and asked her to "manage the ladies in the office."  Doc. 165 at 161. Another Exel employee, Tommy Chambers, testified that Harris was "standoffish" with female employees and treated them differently than male employees.  Doc. 166 at 95.  According to Chambers, Harris would come into work in the morning and "go straight to his office.  He wouldn't speak to any of [the female employees]."  *Id.* at 99.  Chambers also testified, similarly to Travis, that Harris instructed him to address any issues that arose with the female employees, even if those employees normally would report to Harris directly.

The evidence the jury heard also connected Harris's bias against women with his refusal to promote Travis.  Again, the evidence showed that, when she found out Harris had promoted Teal, Travis went to Harris's office and told him

7

that she wanted Teal's vacated position.[2]  Travis testified that Harris's response was dismissive:  he looked her in the eye and told her that he "was never going to" promote her to a supervisor position.  Doc. 165 at 130.  Even though this response was not overtly discriminatory, the jury reasonably could have inferred from the other evidence of bias we have just discussed that Harris's refusal was motivated by Travis's sex.  What is more, Teal testified that when he recommended Travis for his vacated position, Harris's response—which Harris repeated more than once—was that he would never put a woman in a management position.[3]  Viewed in the light most favorable to Travis, Teal's testimony was evidence not only of Harris's bias against women, but also that Harris's bias motivated his refusal to promote Travis despite his discretion to do so.  This evidence is sufficient to tie "*generalized* discriminatory behavior to the *specific* employment decision at issue."  Dissent at 16.

---

[2] This testimony suffices to defeat Exel's argument that Travis cannot recover because she failed to apply for Teal's vacated position.  Even if Travis failed to submit a formal application, the evidence showed that other Exel employees had received promotions through informal requests similar to Travis's.  Indeed, Exel's counsel appears to have conceded that Travis applied for the position when he said, during closing argument, "[n]obody is saying, well, we're defending the case because she didn't apply.  Nobody is saying that.  I'm not saying that."  Doc. 167 at 208.

[3] We recognize that Teal testified inconsistently regarding the timing of Harris's comment, but it was up to the jury, not to us, to consider the credibility of Teal's testimony in light of this inconsistency.  *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) ("[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (internal quotation marks omitted)).  Because we must view the evidence in the light most favorable to Travis, we must accept as true Teal's testimony that Harris made the comment in June 2008 when Teal recommended that Harris promote Travis to Teal's vacated position.

In sum, the jury heard evidence that Harris could have promoted Travis to Teal's vacated position without going through the PTP process at all, and Harris had the discretion—even after he was presented with a PTP candidate—to choose Travis instead of that candidate. Perhaps most importantly, the jury also heard evidence that Harris was biased against women and acted as a result of his bias when he selected Pooler over Travis. The evidence at trial therefore was sufficient for the jury reasonably to conclude that Travis suffered discrimination because of her sex.

## B. Under Our Prior Precedent, the District Court Properly Vacated the Jury's Punitive Damages Award.

The district court vacated the jury's punitive damages award after concluding that Travis had failed to present evidence sufficient to meet our standard in this circuit for imputing punitive damages to Exel. A plaintiff may recover punitive damages in a Title VII action only if the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has held that this standard "focus[es] on the actor's state of mind" and "does not require a showing of egregious or outrageous discrimination independent of" that state of mind. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). But "[t]he inquiry does not end with a showing of the requisite 'malice or . . . reckless indifference'" of the decisionmaker. *Id.* at 539. The

9

plaintiff must also "impute liability for punitive damages" to the employer. *Id.* Here, the district court vacated the jury's punitive damages award based on this imputation requirement.

Before the Supreme Court decided *Kolstad*, we had held that a plaintiff may impute liability for punitive damages to her employer by showing "either that the discriminating employee was high[] up the corporate hierarchy, or that higher management countenanced or approved [his] behavior." *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1323 (11th Cir. 1999) (alterations in original) (internal citation and quotation marks omitted). In *Dudley*, we applied this "higher management" standard and held that punitive damages were unavailable because the two discriminating employees were store managers at one of Wal-Mart's more than 2,000 stores. *Id.* We based our holding on the fact that "Wal-Mart is a giant business" and "[n]either of [the discriminating employees were] high enough up Wal-Mart's corporate hierarchy." *Id.*

Shortly after we articulated the higher management standard in *Dudley*, the Supreme Court took up the same issue in *Kolstad*, 527 U.S. at 539-40. The Supreme Court held that punitive damages are imputable when the wrongdoing employee discriminated while "acting in the scope of employment" and serving in a "managerial capacity." *Id.* at 543. The Court noted that "determining whether an employee [served in a managerial capacity] requires a fact-intensive inquiry," and

10

it instructed courts to evaluate the employee's "type of authority" and "amount of discretion" in making that determination. *Id.* (internal quotation marks omitted). The Court's instruction, which focuses the inquiry on the discriminating employee's authority and responsibilities, appears to conflict with our higher management standard, which looks to the size of the employer and the discriminating employee's rank in the corporate hierarchy. Indeed, the Supreme Court said that "an employee must be important, but perhaps need not be the employer's top management, officers, or directors." *Id.* (internal quotation marks omitted).

We have never squarely addressed the apparent conflict between *Kolstad* and *Dudley*, but Travis asks us to do so in this case. As a panel, however, we remain bound by our prior panel precedent. Even though the Supreme Court decided *Kolstad* after *Dudley*, this court has continued to apply the higher management standard while acknowledging *Kolstad*. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) (citing *Kolstad*, but nonetheless reiterating *Dudley*'s higher management standard); *see also Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 902 n.12 ("Our later decision in *Miller* recognizes that *Kolstad* did not affect [the higher management standard articulated in] *Dudley*; *Miller* reiterates and applies *Dudley's* high-in-the-hierarchy rule."). We are bound, therefore, to apply the higher management standard in this case.

*See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) ("Under [the prior panel precedent] rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.").

Applying that standard, we affirm the district court's conclusion that Travis failed to present evidence sufficient to impute punitive damages to Exel.  First, Travis failed to show that Harris was "high[] up the corporate hierarchy."  *Dudley*, 166 F.3d at 1323 (alteration in original).  In 2008, Harris was but one of 329 General Managers, and he oversaw only 25 employees, which amounted to 0.1% of Exel's employees in North America.  Based on the high number of other employees with his same title and the low number of employees under his supervision, Harris was not sufficiently high up Exel's corporate hierarchy to impute, under *Dudley*, punitive damages to Exel.  *See Ash*, 664 F.3d at 903 (punitive damages unavailable even when the discriminating manager oversaw 1,400 employees, which amounted to 1.5% of the employer's total employees).  Second, Travis also failed to show that "higher management countenanced or approved [Harris's] behavior."  *Dudley*, 166 F.3d at 1323 (internal quotation marks omitted).  Even if other Exel employees were involved in Pooler's PTP transfer, there was simply no evidence that any employee above Harris's rank was aware even that Travis had requested the promotion.

12

In sum, we are bound by our prior panel precedent to apply the higher management standard and therefore affirm the district court's vacatur of the jury's punitive damages award.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order denying Exel's renewed motion for judgment as a matter of law as to liability and granting the motion as to the jury's punitive damages award.

**AFFIRMED.**

13

MOODY, District Judge, concurring:

The issue in this appeal is whether a reasonable jury could find Contrice Travis showed Exel's legitimate, nondiscriminatory business reason for not promoting her was pretextual. The majority opinion correctly describes the burden at trial. First, Travis had to prove a prima facie case of discrimination by showing that sex was a motivating factor in Harris's decision not to hire her for the supervisor position. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981) (applying the *McDonnell-Douglas* burden-shifting framework). Exel then had the burden to offer a legitimate, nondiscriminatory reason for Harris' hiring decision. *Id.* The burden then shifted back to Travis to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

Travis easily satisfied her burden of presenting a prima facie case of discrimination. And Exel met its burden of providing a legitimate, nondiscriminatory reason for Harris's hiring decision. Namely, Exel showed that Harris hired Pooler as the Inventory Control supervisor the same way he filled every supervisor opening up to that time—by submitting a job requisition to Corporate HR and, upon receiving a PTP request from On-site HR, giving that PTP candidate priority above all others. In fact, Exel's other hiring managers had always followed the same company protocol.

14

So we are left with the issue of whether Travis presented enough evidence to show that Exel's nondiscriminatory reason for not promoting her was pretextual. Had it been my decision, I would have answered that question in the negative. Although Travis presented evidence that Harris was biased again women, Travis failed to show that his hiring decision was in any way related to her sex. Rather, my view of the evidence is that Harris's decision was motivated by Exel's PTP policy.

But the issue is whether my view of the evidence is the only reasonable view available. *Lambert v. Fulton Cty., Ga.*, 253 F.3d 588, 594 (11th Cir. 2001). That is not the case here. There is evidence that Harris was biased against women, and that Travis, the most qualified candidate for the position, applied and was rejected before Harris received the PTP request. So there was enough evidence for a reasonable jury to conclude that Harris did not hire Travis because she was a woman. For that reason, I affirm.

15

TJOFLAT, Circuit Judge, dissenting:

I agree that the District Court's vacatur of the jury's punitive-damages award was correct under controlling precedent, but I see no need to reach that issue: on the record presented, no reasonable juror could find that sex discrimination motivated, in whole or in part, Exel's decision to deny Travis the promotion she sought.

In its analysis, the Majority relies heavily on the evidence of Dave Harris's generalized bias toward women in the workplace. This reliance is misplaced. Well-established precedent says there must be sufficient evidence tying *generalized* discriminatory behavior to the *specific* employment decision at issue. Here, the evidence presented by Travis and the EEOC failed to do that, at least in the mind of any reasonable juror. Therefore, I would grant Exel's motion for judgment as a matter of law.

I.

A.

*1. The Company*

Exel was an Ohio corporation headquartered in Westerville, Ohio. It provided supply chain management—such as shipping, receiving, and warehousing—to corporate customers across a variety of industries. Exel was a subsidiary within the Supply Chain Division of Deutsche Post DHL, a multi-

national corporation headquartered in Bonn, Germany.[1]  In 2008, Exel employed

25,000 individuals, including 329 general managers who oversaw individual work

sites in 450 locations in the United States and Canada.

In Fairburn, Georgia, Exel owned a sprawling "campus," wherein it operated

ten distribution sites, each approximately one mile apart.  Each site serviced one

Exel customer.  All told, the Fairburn campus employed around 1,300 individuals

in 2008.  One of the ten sites on the Fairburn campus served Pittsburgh Paint &

Glass ("PPG").  Employees at the PPG facility received, stored, and shipped PPG's

paint and painting-related products.[2]

Exel maintained and widely disseminated written anti-discrimination and

anti-harassment policies at all of its sites.  Exel included those policies in its

Employee Handbook and posted and maintained them on its internal company

intranet.  At the PPG site, a bulletin board adjacent to the breakroom entrance

displayed the policies as well.  Exel trained all employees, including hourly

employees and managerial staff, on its anti-discrimination and anti-harassment

policies and reporting procedures.  Exel also maintained the "NEAR" line, a

confidential hotline through which employees could anonymously raise grievances

or report instances of discrimination, harassment, or other employment issues.

[1] Deutsche Post DHL employed around 470,000 employees in more than 220 countries and territories.  In 2005, DP DHL acquired Exel, a British logistics corporation, for 5.5 billion euros.  Exel became a wholly owned entity of DP DHL but retained the Exel brand for North American markets until January 2016.  Exel is now known as DHL Supply Chain.

[2] The PPG site was one of the smallest on the Fairburn campus.

## 2. The Chain of Command

The General Manager, a salaried position, was the highest-ranking manager at each of Exel's customer sites. The General Manager oversaw all of the site's operations.[3] Next in the chain of command was the Operations Manager. The Operations Manager, also a salaried position, reported directly to the General Manager and oversaw the site's supervisors. Supervisors, the final salaried positions, reported to the Operations Manager and oversaw the hourly workers on each shift.[4] Two or three employees served as supervisors at Exel's PPG site, which operated three work shifts during the period at issue.

Supervisors oversaw shifts of "leads" and other hourly workers. Leads were responsible for coordinating work among groups of hourly shift workers. For example, an inventory lead at the PPG site delegated tasks among inventory control clerks and other workers with inventory responsibilities. Aside from leads, Exel employed approximately twenty to twenty-five hourly shift workers on its PPG site. Shift workers included taskers, who functioned similarly to shipping clerks, inventory control clerks, packagers, quality controllers, and pickers, who pulled orders for outbound shipments.

---

[3] The General Manager reported to the Director of Operations responsible for the Fairburn campus. The Director of Operations maintained an office on the Fairburn campus.

[4] Throughout the trial and in the parties' briefing, supervisors are also referred to as Shift Supervisors, Operations Supervisors, and Inventory Supervisors, often with overlapping and unclear differentiation in duties. For our purposes, the term "supervisor" encompasses all potential titles given to salaried employees who possessed supervisory authority.

18

Exel's main corporate headquarters in Ohio housed Exel's primary human resources department ("Corporate HR"). The Fairburn campus also contained a local human resources department ("On-site HR"). HR managers at the Fairburn campus handled personnel issues arising there. This included investigating discrimination claims and serving as a liaison between the Exel sites on the Fairburn campus and Corporate HR. The HR staff at the Fairburn campus included one HR manager and several HR representatives responsible for the Exel sites on the campus.[5]

### 3. How Exel Filled Open Jobs

The Hiring Manager at each site was responsible for interviewing and selecting candidates to fill vacancies. Typically, there was one Hiring Manager at each Exel site. On many sites, including the PPG site, the General Manager served as the Hiring Manager. Rather than soliciting applications or resumes for job openings himself, the Hiring Manager interviewed and made a final selection from among the list of candidates provided by HR.

When a job came open at an Exel site, the Hiring Manager submitted an online job requisition for the vacancy in Exel's Oracle database.[6] The job

---

[5] The number of sites one HR representative oversaw depended on the size of the site and the number of employees on the site. HR representatives had an office in the Campus HR building.

[6] Oracle is a third-party online database that assists HR with employment and personnel logistics. At Exel, Oracle was housed on the company's intranet and accessible by all HR officers. The general public could not access Oracle.

requisition included the job opening, date, position title, reasons why the position needed filling, and a description of the duties the job entailed. After submitting the requisition, the ball left the Hiring Manager's court: Submittal of a job requisition notified Corporate HR of a vacancy and the onus fell on it to post the job and locate interested candidates.[7]

After Corporate HR got the job requisition from a site's Hiring Manager, it reviewed and approved or rejected the vacancy. After Corporate HR processed and approved a requisition, Oracle automatically posted a job listing on a database on Exel.com. This database contained all of the current job openings at Exel. All candidates could view the database of job openings on Exel.com. Once Oracle posted the open position on Exel.com, Corporate HR received both internal applications (from current Exel employees) and external applications (from the general public) through the database. Only Corporate HR received those applications.[8]

Once Corporate HR approved and posted a job requisition, candidates were identified through three different protocols. The reason HR identified the candidate for the job dictated the next steps in the process and governed how, if at all, that candidate's qualifications were weighed against those of other candidates.

---

[7] HR employees, regardless of their role or whether they worked in Corporate HR or on the Fairburn campus, could view the job requisition on Oracle.

[8] Although Corporate HR was responsible for receiving and processing applications, On-site HR employees could still access and view all applications through the database.

The first protocol involved external candidates.  External candidates applied on Exel.com.  Corporate HR received, processed, and vetted all external applications. Corporate HR then presented the best candidates to the site's Hiring Manager. From there, the Hiring Manager interviewed them and made the final choice. Internal applicants could also apply through Exel.com and have their applications processed in the same fashion, in lieu of the internal process described below.

The second protocol involved internal candidates who did not apply through Exel.com.  Internal candidates could complete an internal application for the open position.  The internal application was a short, one-page form completed by a current employee to express interest in another position at the company.  The form, which could be handwritten, included the employee's name, the position desired, and the employee's current supervisor.  The current employee gave the internal application to his or her supervisor, who forwarded it along until it reached on-site HR.  On-site HR would then send the internal application to Corporate HR. Corporate HR would place the internal application with all other applications received, both internal and external, and consider them together before forwarding the best candidates on to the Hiring Manager.

The third protocol involved Exel employees who either worked at sites that were due to close or were set to be affected by downsizing.  To prevent terminating those employees from the company entirely, Exel maintained a company-wide

21

priority transfer practice ("PTP").[9]  When a customer site at the Fairburn campus was about to close or undergo a workforce reduction, On-site HR tried to match the site's employees with job openings at other customer sites on the campus for which they were qualified.

In the case of PTP transfers, On-site HR, rather than Corporate HR, handled the process entirely.  The HR employees familiar with the impending closure or workforce reduction viewed the list of vacancies at other sites on Oracle and attempted to match employees subject to layoff to those vacancies for which they were qualified.  Additionally, On-site HR provided the general manager of the closing site a list of campus-wide vacancies to relay to employees subject to layoff.  The employees only needed to meet the minimum qualifications required for an open position in order for On-site HR to consider them for a transfer into that position.  The motivation behind this was simple: Exel aimed to avoid laying off its employees by identifying other opportunities for them within the company.  Hence, those employees at risk of imminent termination got first priority in filling vacant positions, with no weighing of their qualifications against those of external or other internal candidates not in imminent danger of being laid off.  Since HR facilitated the process on its own initiative, priority transfer employees were not required to complete an application to be considered for an open job at another site.

---

[9] Exel implemented the PTP on the Fairburn campus over a decade ago.

Once On-site HR matched a PTP candidate with an open position, it sent the candidate's information to the Hiring Manager. If the candidate met the minimum qualifications needed for the job and passed an interview with the Hiring Manager, the candidate got the job without any consideration of external or non-PTP internal candidates. This transfer occurred regardless of whether the Hiring Manager considered the priority candidate the "best" applicant or fit for the position.

*4. Facts Leading to the Dispute at Hand*

In 2005, Exel hired Travis as an hourly worker at the PPG site. Within the year, the General Manager promoted Travis to Inventory Control Lead, another hourly position.[10] In May 2006, Dave Harris joined Exel as the Operations Manager of the PPG site. In November 2006, Harris became General Manager of the PPG site.[11]

During his tenure as General Manager, Harris filled three open supervisor positions—February 2007, April 2008, and the at-issue June 2008 position.[12] That he filled the first two openings with PTP candidates is not in dispute.[13] It is also

---

[10] At the time of this promotion, the General Manager was Bob Browne.

[11] Dave Harris replaced Bob Browne when Browne left Exel's PPG site in November 2006.

[12] Harris testified he first learned about the PTP from Marie Murphy, a Campus HR representative, in February 2007, when Harris filled the first supervisor vacancy following his appointment as General Manager. Travis testified that Harris informed her about the PTP in early 2007. Travis also testified that she spoke with Harris on numerous occasions regarding two open shift supervisor positions; however, she could not remember dates.

[13] In February 2007, Harris hired Calvin Sawyer into an open supervisor position. After Harris completed a job requisition for the open position, Murphy gave Harris Sawyer's name as a

undisputed that he filled the third, the opening Travis wanted, with a PTP

candidate referred to him by Franklin Hudson, an On-site HR representative who

oversaw the PPG site and other sites on the Fairburn campus.

The third supervisor position arose in June 2008, when Harris promoted

James "Kenny" Teal to Operations Manager.  Pursuant to the standard practice,

Harris filled out a job requisition for the supervisor position vacated by Teal and

submitted it to Corporate HR.  In mid-June, Corporate HR approved the requisition

and posted the job listing on Exel.com.  Lisa Guydon, an On-site HR

representative who worked on the Fairburn campus at the time, testified that five or

six individuals applied online for the open position.

Thereafter, Hudson presented Michael Pooler, who previously worked as a

quality assurance coordinator at Exel's Hawaiian Tropic site, to Harris as a PTP

candidate for the supervisor position.  At the time, the Hawaiian Tropic site was in

---

priority transfer.  Sawyer's current site downsized and Sawyer faced a layoff.  Sawyer's name was the only name given to Harris.  Harris interviewed Sawyer, learned of his extensive management experience, and spoke with Sawyer's supervisor.  Harris hired Sawyer through the PTP.

In April 2008, Sawyer left the PPG site, creating a supervisor vacancy.  Harris completed a job requisition and Franklin Hudson, an On-site HR manager, gave Harris Jim Russell's name as a priority transfer.  Russell worked as a supervisor at Exel's Scotts site and faced a layoff.  Harris spoke with Russell's former supervisor at the Scotts site and interviewed Russell.  Russell was the only candidate that Hudson gave Harris for consideration.  Harris hired Jim Russell through the PTP.

After Harris filled the February 2007 position through the PTP, Travis said she spoke with Tommy Chambers, the Operations Manager, about what she needed to do to advance herself.  Chambers told Travis that she could look for opportunities at other Exel facilities or outside the company because no supervisor positions were currently available at the PPG site and Harris believed Travis needed more time for development.

the midst of a workforce reduction and had scheduled Pooler to be laid off. Hudson and Pooler's boss, Mike Blose, met with Pooler on a Saturday and informed him of the potential availability of the position at the PPG site. According to Travis, Blose told Pooler to keep quiet about the opening; otherwise, the position would no longer be available. Hudson testified he recommended Pooler to Harris as a PTP candidate because Pooler possessed supervisory experience with Exel and met the minimum qualifications for the open position at the PPG site.[14]

Afterwards, Pooler's position at the Hawaiian Tropic site was eliminated and he waited at home for two weeks before Harris called him to setup an interview for the job at the PPG site. Harris said he interviewed Pooler and considered him qualified for the open position. Harris testified that because Pooler met the minimum qualifications for the position and passed the interview, Harris transferred Pooler into the job as he would any PTP candidate presented to him to fill an open position. Harris claimed he never considered whether or not Pooler was more or less qualified than Travis or any other applicant who applied internally or through Exel.com, because Hudson gave him Pooler's name as a PTP candidate and he met the minimum qualifications for the job.

---

[14] Pooler managed over fifty employees at in his role at the Hawaiian Tropic site.

Travis and the EEOC largely do not dispute this version of events, but they do dispute the motives behind Harris's failure to promote her into the job instead of Pooler. Travis testified that before Harris put Pooler into the job, she told him she wanted to be considered for it. She said that since the job involved inventory-related duties that she believed she could handle with ease, she felt highly qualified and motivated to take on the role. Travis did not apply formally for the open position, either by applying through the website or completing an internal application. She alleged that she never applied because the job listing posted on Exel.com was for an "Operations Supervisor," when in actuality the position Kenny Teal vacated was an "Inventory Control Supervisor." She said she was interested in what she considered the real position: Inventory Control Supervisor, not the fictitious "Operations Supervisor" position posted on the site. Moreover, she alleged, although she would have formally applied anyway, Harris made clear she wasn't getting the job. Travis testified that Harris told her, "Contrice, just stop asking me, I'm not going to do it. . . . I can't, I'm not going to do it. I won't do it."

After Pooler began working at the PPG site, Harris assigned Pooler to train with Travis on the site's inventory procedures and systems. Realizing she was training Pooler for the supervisor position Teal vacated when he was promoted to Operations Manager, Travis began looking for a new job out of frustration. She found a new job with another company in mid-July 2008 and turned in her two-

26

weeks' notice.  After she left Exel, Harris formally announced Pooler's role as Inventory Control Supervisor and gave him responsibility for the duties Travis previously performed.

## B.

Travis filed a discrimination complaint with the EEOC in January 2009.  In her complaint, Travis alleged that she was passed over for promotions at Exel because of her gender.  In response, Exel claimed it filled all open supervisor positions during Travis's tenure through routine application of the PTP.[15]  Exel further alleged that Harris encouraged Travis to apply for the open position, but Travis told Harris that "she wasn't interested" in taking a supervisor position because "everyone knew her and she thought it would be difficult to transition from co-worker to supervisor."

The EEOC investigated Travis's allegations and concluded that Harris did not want to promote Travis because of her gender.  It relied on Travis's narrative of past interactions with Harris and On-site HR, and testimony by Kenny Teal that Harris told him "behind closed doors" that he would never make a woman a manager.[16]  Relying on this evidence, the EEOC concluded that Travis was

---

[15] Lisa Guydon prepared Exel's position statement in response to Travis's EEOC complaint.

[16] Travis claimed that in 2007, she told On-site HR representative Marie Murphy that she believed Harris would not promote her because she was a woman.  Travis said she originally complained to Murphy because she believed Murphy was the HR representative over her site and because she had known Murphy a long time.  Travis said Murphy told her she could not act on

discriminated against because of her gender, and it brought this Title VII action

against Exel on Travis's behalf.

## II.

We review a district court's denial of a Rule 50(b) renewed motion for

judgment as a matter of law ("JMOL") *de novo* and apply the same standard as the

district court. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000). We "draw

Travis's complaint because Franklin Hudson, not Murphy, oversaw the PPG facility. Travis alleged that Murphy advised her to document everything she could and then take her complaint to Hudson. At the time of this alleged conversation, there were no supervisor vacancies at the PPG site.

Hudson oversaw the PPG site and it was his responsibility to investigate claims of discrimination. Travis testified that Hudson said "his best advice was to tell [her] to look into transferring to another site." However, on cross-examination, Travis admitted that she did not tell Hudson that she felt Harris discriminated against her because she was a woman. Travis believed this conversation occurred in early 2008. Hudson testified that he had no memory of speaking with Travis in his office or of Travis telling him that she was discriminated against due to her gender. Hudson testified that if she had done so, he would have started an investigation pursuant to the company's protocol for handling discrimination complaints. There were no supervisor vacancies at the time of Travis's conversation with Hudson, either. Hudson was promoted to HR Manager in 2008, after the alleged conversation with Travis.

Exel had no written record of this conversation, or any other conversation between Travis and an HR representative. Additionally, Exel had no record of Travis utilizing Exel's NEAR hotline for voicing complaints and reporting discrimination. Exel had no record of any other discrimination complaints made against Harris by Travis or any other employee.

Teal testified that he told Harris that Travis would be a strong candidate for a promotion to supervisor. Teal said that Harris responded by claiming that Travis lacked the necessary qualifications and experience to hold a supervisor position, and that he would not put a woman in a management position. Teal never reported this comment to HR. On direct examination at trial, Teal testified that the comment was made after Harris promoted Teal to Operations Manager in 2008. On cross-examination, Exel's attorney introduced an affidavit made by Teal in 2010—the first time Teal ever stated that Harris made the remark. In this affidavit, Teal stated that Harris made the remark in 2007. When further questioned, Teal testified that he could not recall the dates of any of these conversations, or the month or year in which Harris said that he would not put a woman in a management position. Teal did not tell anyone about the comment when Travis resigned in 2008, or during his conversation with Lisa Guydon, one of Exel's Campus HR managers, during her investigation into Travis's EEOC complaint. Exel fired Teal in June 2009 after Teal faced allegations and formal complaints of sexual harassment.

28

all factual inferences and resolve all credibility determinations in favor of the non-moving parties." *Munoz v. Oceanside Resorts,* Inc., 223 F.3d 1340, 1344 (11th Cir. 2000). Nevertheless, to survive a JMOL motion, the non-movant must produce "more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel*, 210 F.3d at 1337. Put differently, there must be a "substantial conflict in the evidence." *Id.* Denial of a JMOL motion is appropriate only when "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* at 1337 (internal quotations omitted).

In a Title VII discrimination case, the plaintiff must prove that an unlawful employment decision took place by preponderance of the evidence. *Walker v. Mortham*, 158 F.3d 1177, 1184–85 (11th Cir. 1998). A complaining party establishes an unlawful employment practice under Title VII by demonstrating that gender "was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). She can do this by either "persuading the court that a discriminatory reason more likely motivated the employer," or "by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981). In other, simpler words, the plaintiff must show that the

nondiscriminatory explanation offered by the employer "was not the true reason for the employment decision." [17]  *Id.*

In this case, a reasonable factfinder could not conclude, on the evidence presented, that Exel's proffered nondiscriminatory motive for denying Travis the job was pretextual.  The evidence Travis and the EEOC presented, when construed in the light most favorable to their case, established Dave Harris's *general* bias toward women in the workplace.  However, that evidence did nothing to disprove Exel's assertion that the *specific* personnel position at issue in this case was filled via routine application of its priority transfer practice—an assertion that was corroborated by multiple witnesses and documentation and admitted by Travis and the EEOC's own witnesses.  Thus, the evidence was insufficient to lead a reasonable factfinder to conclude that Harris's alleged bias was a motivating factor behind the decision—a decision that HR initiated and facilitated, and that Harris made wholly pursuant to the company's standard protocol.

a.

This case turns on whether or not Exel's decision to place Michael Pooler into the supervisor job at issue was a "routine application" of the PTP.  Exel says that the PTP process was open-and-shut: if a candidate had the minimum

---

[17] Before making this showing, the plaintiff must first show that she was qualified for the job and either that she applied for the job or that applying for the job would have been a "futile gesture" under the circumstances.  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1094; *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66, 97 S. Ct. 1843, 1870 (1977).

qualifications and passed an interview with his prospective new boss, he got the job, simple as that. In Exel's view, that's exactly what happened here: Dave Harris never considered Travis or any other interested candidate besides Pooler, not because of sex, but simply because Pooler was given priority through the PTP and passed the interview. Travis and the EEOC disagree. They argue that the PTP was "merely pretextual."

That the PTP existed went undisputed at trial. Franklin Hudson, the On-site HR Manager assigned to the PPG facility at the time Pooler's transfer took place, testified the practice existed since at the least the time he joined Exel in 2005. He reported that he "placed over a hundred associates" in new facilities using the practice when two different facilities closed in 2007. Hudson explained the rationale for the practice was "to save the company, to cut down on unemployment claims, litigation, and to simply place that associate." In fact, Hudson testified that Harris filled an open supervisor position in 2008 at the PPG facility by transferring a supervisor named Jim Russell from another Exel facility that was due to close. And Harris testified that he filled another open supervisory position in 2007 (before Hudson assumed oversight of the PPG facility) by transferring Calvin Sawyer from the company's soon-to-be-closed Icon facility. Travis's witness, Tommy Chambers, agreed regarding Sawyer's transfer.

31

Other witnesses corroborated this testimony.  Lisa Guydon, an On-site HR manager who worked at Exel's Fairburn campus, said the PTP was a "company-wide" practice.  She testified that from 2007–08, Exel closed down or reduced its workforce in four of its sites located on the Fairburn campus: Kellogg, Icon, Scotts, and Hawaiian Tropic.  She estimated that the company transferred "over 200 associates" from those facilities to other sites.  Travis and the EEOC did not contest any of those assertions, and Travis admitted that she knew of the program's existence before Pooler's June 2008 transfer.

Nevertheless, Travis and the EEOC argue that, with respect to Pooler's transfer, the PTP was a smokescreen to cover for Dave Harris's bias toward women in the workplace.  To establish that bias, they cite testimony by Travis and by Kenny Teal, the employee whose promotion made way for Pooler's transfer.  Travis testified that Harris treated women at the PPG facility differently than he treated men.  She reported that Harris "limited his contact with pretty much all the females in [the PPG] office."  Teal testified that, "in his office behind closed doors," Harris told Teal on "a couple" occasions that Harris "said that he would not put a woman into a management position."[18]  Teal further testified that in his seven

_____

[18] Teal's testimony was conflicted as to when Harris supposedly told Teal he would never put a woman into a management position.  In his deposition, he stated that Harris made the comment in 2007, but he testified at trial that Harris made the comment in 2008, around the time he promoted Teal to Operations Manager and transferred Pooler into Teal's old job.  I construe this testimony in Travis and the EEOC's favor and thus accept that Harris made the comment in 2008.

years with Exel, "there was never a female in any management position."  In addition, Tommy Chambers, a supervisor at the PPG facility in 2008, testified that Harris was "more standoffish towards females" than he was toward men.  In fact, according to Travis and Chambers, Harris so disdained dealing with women in the office that he told Travis that he wanted her "to manage the ladies in the office" and asked Chambers to "address them" even though they reported directly to Harris and did not answer to Chambers.

Additionally, Travis stated that she went to On-site HR to express her feeling that she was being treated differently by Harris because she was a female. She related that she first spoke with Marie Murphy, an HR coordinator at the site, and that Murphy said she could relate to Travis's concerns because she too had been "overlooked or passed on for promotion" because of her gender.  However, according to Travis, Murphy could not help her because the HR manager responsible for the PPG site was actually Franklin Hudson.  So, Travis testified she then went to Hudson in early 2008 to voice her concerns.  She asserted that Hudson gave her concerns short shrift.  She testified that Hudson "seemed like he had somewhere to go" and that "his best advice was to tell [Travis] to look into transferring to another site."[19]

---

[19] However, Travis conceded she didn't tell Hudson specifically that she felt she was being discriminated against because she was a woman.

33

Travis and the EEOC next point to circumstantial evidence surrounding the events leading up to Michael Pooler's transfer as proof that Harris's general animus was a motivating factor in not considering Travis for the job. In their view, a reasonable factfinder could draw this inference based on three observations. First, they argue that the "Operations Supervisor" job Harris posted in June 2008 was a "phantom" job opening designed to conceal the true position that was open, namely the "Inventory Control Supervisor" position. Second, they argue that Exel did not follow the procedures it claimed were part of the PTP. Third, they point to comments Harris allegedly made to Travis when she expressed interest in the job, as well as other circumstantial evidence of Harris's alleged bias, including that Travis was qualified for the position yet was not considered.

To establish that the "Operations Supervisor" job Harris posted was a "phantom" job, they refer to Teal's testimony that the job Teal performed prior to his promotion was an "Inventory Control Supervisor" job and that Harris told Pooler his title was "Inventory Control Supervisor." They also point to Travis's testimony that Harris told his staff in a meeting that he was making Teal "Inventory Control Supervisor," testimony that other supervisors and PPG's on-site representative called Teal's job "Inventory Supervisor," and to the letter Pooler received when his position at the PPG site was eliminated, which stated that Pooler's title was "Inventory Management Supervisor." At trial, Travis and the

34

EEOC presented an announcement Harris distributed to employees at the PPG site that stated Teal had moved up "through the management ranks as operations supervisor, training supervisor, *inventory management supervisor*, systems 'super user' and special service projects supervisor." (Emphasis added).

In their view, this evidence, along with the fact that Teal said he only supervised Travis and no one else, confirmed that the vacancy left open was in fact "Inventory Control Supervisor." From this, they argue one could infer that Harris posted the job requisition for an "Operations Supervisor" on Exel's website with the "specific intent" to deceive Travis into not applying for the "Inventory Control Supervisor" job, the true position left vacant by Teal's promotion and the job Travis really wanted.

Next, Travis and the EEOC argue that the evidence demonstrated that Exel did not follow the procedures normally used in the PTP when it moved Pooler into the job. They argue that Exel deviated from the standard protocol in two respects: first, Pooler was in fact "promoted" and not "transferred"; and second, the transfer was done in secret rather than openly. With respect to the former, they base this assertion on the fact that Pooler's job title prior to the transfer was "Quality Assurance Coordinator" and did not include the term "Supervisor," that he did not have supervisory responsibilities, and that he did not have inventory control experience. With respect to the latter, they argue that Exel deviated from standard

35

procedures when its employees told Pooler to keep quiet about the position at the PPG site while his transfer was still pending. Pooler testified that when he was summoned to meet with Franklin Hudson and Mike Blose, the General Manager at the site from which he had been laid off, to talk about the opening at the PPG facility, Blose told him to "keep your mouth shut" and not to say a word about the position opening, else "the position w[ould] not be available." They argue that a factfinder could infer from this that those employees told Pooler to keep quiet about the opening in order to keep Travis in the dark about the job.

From these two alleged policy deviations, Travis and the EEOC contend that a reasonable factfinder could infer that Exel and Harris used the PTP as a pretext to cover up the true, discriminatory motive behind their failure to consider Travis for the job. *See Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 951 (11th Cir. 1991) ("Oftentimes, departures from well established guidelines are indicative of attempts to conceal a discriminatory motive through the use of ad hoc criteria which allow the defendant to cloak a discriminatory intent in ostensibly neutral rationales.").

Additionally, Travis testified that when she learned of Teal's promotion to Operations Manager and went to Harris to express her interest in backfilling Teal's old position as Inventory Control Supervisor, Harris told her he was simply never going to make her a supervisor. She testified, "at that time [Harris] told me he was

36

not going to make me, like, flat out, Contrice, just stop asking me, I'm not going to do it. . . . I can't, I'm not going to do it.  I won't do it."  Travis and the EEOC further point out that Harris admitted in his testimony that he never considered Travis for the job.  Thus, they argue, taken in concert with the circumstances surrounding Pooler's placement in the position and the testimony about Harris's prior comments about and behavior towards women, Harris's declaration to Travis shows that Travis's gender played a part in Harris's selection of Pooler over her for the position.

Finally, Travis and the EEOC point to undisputed trial testimony by numerous witnesses that Exel did not place any women into management positions at the PPG site for many years as additional circumstantial evidence of discrimination by Harris and Exel.

In Travis and the EEOC's view, all of this circumstantial evidence established that Harris's bias lurked in the background at the time he filled the supervisor position.  And, they argue, the circumstances surrounding Pooler's transfer established that that bias lay at least in part behind Harris's decision not to promote Travis into the job.  In their view, this was enough to allow a reasonable factfinder to conclude that the PTP was pretextual.

b.

37

Suitable as it may be to establish Harris's *general* bias toward women in the workplace at the JMOL stage, the evidence Travis and the EEOC cite to support their case falls short concerning the ultimate issue in this case. Without question, a plaintiff can rely on generalized sexist comments as circumstantial evidence to show employer discrimination. But acting alone, that evidence cannot win the day for a plaintiff if it is not reasonably linked to the alleged discriminatory employment action in question. The evidence must allow the factfinder to *reasonably* infer that such animus was a "motivating factor" behind the adverse employment action at issue. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S. Ct. 1775, 1791 (1989) ("Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be evidence that gender played a part."); *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1232–33 (11th Cir. 2016). Put simply, the biased decisionmaker must have the opportunity to *act* on his bias.

Construed in Travis and the EEOC's favor, Teal's testimony about Harris's comments about women, taken in concert with Travis and Chambers' testimony about his behavior toward women in the office, would allow a reasonable factfinder to conclude that Harris harbored discriminatory animus toward female

38

employees at Exel's PPG site, including Travis. The same is true with respect to Harris's alleged declaration to Travis that he was "not going to do it" when informed by her of her interest in being promoted into the job Teal vacated. But the evidence the Majority relies on to demonstrate that Harris had any chance in the process to put his bias into action cannot perform that function.

Even when all inferences are drawn in Travis and the EEOC's favor, the evidence in the record conclusively established that the PTP existed and was used frequently at the PPG site and other Exel sites on the Fairburn campus. The evidence further established that HR, not general managers like Harris, facilitated PTP transfers and initiated them by identifying suitable candidates. And the evidence conclusively established that PTP candidates who were minimally qualified transferred directly into their new jobs without competing against other interested, non-PTP applicants. While it is true that general managers like Harris had final say over whether a PTP candidate got the job, the evidence conclusively established that rejection of a qualified PTP candidate rarely if ever occurred. Indeed, Franklin Hudson testified that in his "six or seven years" with the company, a general manager never vetoed a single one of the hundreds of PTP transfers he oversaw. Lisa Guydon testified that she never saw such a veto in ten years of employment with Exel. Clearly, the company expected general managers to give PTP candidates the benefit of the doubt: Guydon testified that a general

39

manager who turned down a PTP candidate would have to explain the basis of that decision to his superiors. The policy was simple: if you are a PTP candidate and you qualify, you get the job.

Turning to Pooler's transfer specifically, considered in its most favorable light, the evidence Travis and the EEOC cite does not cast suspicion on Exel's contention that the PTP functioned as it normally did with respect to Pooler. This is so for multiple reasons. First, there is insufficient evidence upon which to reasonably conclude that Harris concealed the true position he was seeking to fill when he posted a requisition for "Operations Supervisor" after he promoted Teal. Whether it was called "Operations Supervisor" or "Inventory Control Supervisor," the position Pooler filled was the third supervisor job at the PPG site. It is undisputed that Teal was previously promoted to Operations Supervisor in 2005 (before Harris became General Manager of the PPG site). Teal himself testified that the PPG site always had three supervisors (one for each of the site's three work shifts) until the site downsized the third shift and no longer needed a supervisor to manage the skeleton crew that remained on that shift. In fact, he testified that he was the third-shift supervisor prior to the shift's downsizing. Teal further testified that, counting the "Inventory Control Supervisor," the PPG site continued to have three supervisors after the downsizing. With regard to his "transfer" to the Inventory Control Supervisor position from Operations

40

Supervisor, he testified that he never applied for the job, filled out any paperwork to be considered for the job, or received a pay raise because the job was just a "lateral transfer."

Further, the evidence Travis and the EEOC cite in support of their contention that the "Operations Supervisor" position was a "phantom" job simply buttressed Exel's argument that Harris posted the opening to hire a third supervisor. The notice Harris created to announce Teal's promotion stated that he performed five different functions during his time at the PPG site prior to his transfer. Teal himself testified that those listed "positions" were "just some of the roles that they asked [him] to perform while [he] was supervisor." In other words, all of those titles simply described different responsibilities included among the duties of a supervisor at the site. So, to conclude that "Inventory Control Supervisor" was a separate, formal position at the PPG site, the factfinder would also have to conclude that the other four titles mentioned in the announcement were separate positions as well. Yet no evidence in the record suggests this was the case, or even suggests this was possible.

It is undisputed that the position Harris posted when he submitted the job requisition to Corporate HR was for an "Operations Supervisor." It is also undisputed that the offer letter issued to Pooler when he took the position listed the job as "Operations Supervisor." And Hudson testified that Corporate HR had to

41

approve job requisitions before those jobs were posted.  What's more, Guydon, Hudson, and Harris all testified that HR—not general managers like Harris—facilitated the PTP by identifying candidates who were about to be affected by site closures or workforce reductions and forwarding those candidates to hiring managers seeking to fill open positions.  Guydon explained that, by matching up qualified employees whose jobs were about to be eliminated to unfilled vacancies at other facilities, On-site HR was "the traction in trying to identify an opportunity" for associates affected by site closures and downsizings.  This was true with respect to Pooler's transfer as well: both Hudson and Harris testified that Hudson presented Pooler to Harris as a candidate to fill the position left open by Teal's promotion, along with a positive recommendation, when the Hawaiian Tropic facility was winding down its operations.  And Travis and the EEOC did not dispute that Hudson provided this referral to Harris.

Thus, to find that Harris sometimes referred to the supervisor position as "Inventory Control Supervisor" and other times called it "Operations Supervisor" specifically to mislead Travis into not applying for it, the factfinder would have to conclude that both On-site HR and Corporate HR managers colluded to help Harris hide his bias and fool Travis, not just in hindsight but in real time.  Hudson testified that his off-site higher-ups in Corporate HR had to approve all job requisitions submitted by site managers before they were posted and filled.  So, to

conclude that the job posting was a sham to deceive Travis, the factfinder would have to likewise conclude that those higher-ups endorsed the existence of a fraudulent "Operations Supervisor" position that did not really exist. And they would have to endorse screening, interviewing, and transferring or promoting interested candidates into that non-existent job, only to later move them into the real job. But Travis and the EEOC presented no evidentiary fulcrum upon which this conclusion could rest.

Next, Travis and the EEOC's assertion that Exel failed to follow the standard PTP procedure is unsupported by the evidence presented. To begin, the evidence failed to establish that Pooler was promoted, not transferred. Travis and the EEOC rely on the fact that Pooler was a "Quality Assurance Coordinator" at the Hawaiian Tropic site before he moved into the supervisor position at the PPG site. Hudson testified that although "their job description[s] may be different," in general, coordinators at Exel were "a step under supervisor[s]," and that coordinators (Pooler's previous title) and leads (Travis's title) were "equal in pay." Though this might have been true in general, the undisputed evidence showed that this differed in Pooler's case. Both Pooler and Franklin Hudson testified that Pooler "supervised a large number of employees" and wielded "[c]ontrol over the entire quality operations" at the Hawaiian Tropic site before transferring. And Pooler's pay classification did not change when he took the new job. He was

43

classified as salaried, not hourly, in his old job, and he remained salaried in the new position. Pooler, testifying as part of Travis's case-in-chief, agreed that this was the case. Further, all of the paperwork Pooler signed when he moved to the PPG facility listed his move as a "transfer." Pooler testified that when he moved into the position at PPG from his prior job at Exel's Hawaiian Tropic site, he was told, "you don't have to do anything, it's just an internal transfer." When asked on cross-examination whether he considered the move to be a transfer, Pooler said "yes." By contrast, Travis does not dispute that she was an hourly worker whose job title was "Inventory Lead," a position Travis admitted was "below supervisor." She further admitted that while she at times oversaw other workers as Inventory Lead, she did not have "write up" authority over them. To put Travis into the position, then, Exel would have been required to increase Travis's pay, convert her position into a salaried rather than hourly position, and increase her supervisory authority. What's more, Harris testified without dispute that to transfer Pooler into Travis's Inventory Lead position instead, Exel would have to demote Pooler and cut his pay.

Further, the evidence conclusively established that a PTP candidate's qualifications, not his formal position in the company hierarchy, dictated whether he got the job. Hudson explained that the central inquiry with respect to job openings was whether the potential transferee was qualified for the position:

44

> Okay, that practice, the priority transfer practice is if a site is closing or if there is a downsizing.  So that would mean any associate at that site would be losing their job.  So what we would do as H.R., . . . we ensure that we try our best to make sure that no associate lose[s] their job.  So if we [have] ten sites and if they got openings, those associates *if they meet the minimum qualifications* will be placed in a job.

(Emphasis added).  Guydon agreed that the prospective transferee's qualifications were central to his placement.  She described the priority transfer practice thusly:

> Priority simply means that we are going to give that person that we have identified who is going to be without an opportunity a shot at interviewing for that position.  So they interview for the position.  *If their qualifications meet* and they pass the interview process, they are automatically going to receive that position.

(Emphasis added).  Neither Exel nor Travis and the EEOC presented evidence suggesting otherwise.

And Exel did not deviate from this requirement when it moved Pooler into the supervisor job.  Exel presented evidence that Pooler possessed the qualifications needed for the job at the PPG site.  Both Pooler and Franklin Hudson testified that Pooler "supervised a large number of employees" and wielded "[c]ontrol over the entire quality operations" at the Hawaiian Tropic site before transferring.  This evidence is crucial, because even if it is accepted that Pooler's transfer was a "promotion" instead of a "lateral transfer," the transfer was based on the candidate's qualifications, just as all PTP transfers were.  Travis and the EEOC rely on Hudson and Guydon's testimony to establish that PTP transfers were

45

always "transfers" and not "promotions," but as shown above, Hudson and Guydon both testified that the potential transferee's qualifications, not his formal job title, governed whether he fit the open position.

Similarly, this evidence also answers the argument that Travis's greater qualifications for the job circumstantially supported a finding of discriminatory intent on Harris or Exel's part. Accepting as true the assertion that Travis was more qualified than Pooler at the time of the transfer, this fact is irrelevant. The central feature of the PTP, as explained by Hudson, Guydon, and Harris, was to give minimally qualified employees who were about to be laid off priority over other internal and external candidates, including those who might be more qualified. With regard to candidates interviewed through the PTP, the dispositive question was whether they met the *minimum* qualifications for the open position and passed the interview, not whether they were more qualified than other, non-PTP candidates.

With respect to the allegation that Exel deviated from the standard PTP protocol when Hudson and Blose told Pooler to "keep quiet" about the position, I give Pooler's testimony the full benefit of the doubt and thus accept as true that this conversation took place. I accordingly accept the argument that this constituted a deviation from Exel's standard practice when it made use of the PTP. Even so, the conversation is not reasonably probative of a discriminatory cover-up.

46

To construe Blose and Hudson's instruction to Pooler as circumstantial evidence of discrimination, a factfinder would have to conclude that both Hudson and Blose were in on Harris's conspiracy to deny Travis the position. But this conclusion cannot reasonably rest on this one alleged conversation. A General Manager at a facility on the cusp of closing might choose to keep potential promotions private for many reasons. For example, he might want to avoid drawing undue attention to the transferee that could result in bad blood between the transferee and those whose jobs are to be completely eliminated. He might want to stave off the spread of rumors about possible position openings before those openings are certain, so as not to create false hope in the minds of those about to lose their jobs. Or he might even be doing so in a show of improper favoritism—perhaps unlawful or perhaps not—toward one of his employees.

But here, to adopt Travis and the EEOC's view of those events, the factfinder would have to read this instruction not as proof that Blose was biased toward *his* female employees, but that both Blose and Franklin Hudson willingly signed on to Harris's discriminatory conspiracy to shut one of *Harris's* employees, namely Travis, out of the job.[20] Standing alone, Blose's instruction to "keep your

---

[20] As the Majority acknowledges, the District Court found no evidence that HR or Harris's superiors had actual knowledge that Harris discriminated against Travis in transferring Pooler into the position. In addition to the reasons discussed here, this finding by the District Court further precluded a finding that HR colluded with Harris to deny Travis the position. It stands to reason that HR could hardly have joined Harris's conspiratorial plan, given that it had no knowledge of that plan.

47

mouth shut" cannot establish the existence of such a sprawling plot. The record does not even establish that Blose knew Travis or knew who she was at the time.

Moreover, Travis and the EEOC did not present any evidence that suggested Harris orchestrated the events leading to Pooler's placement in the job. Travis and the EEOC did not dispute that Harris filled out a job requisition for an open supervisor position. They did not dispute that Corporate HR approved the vacancy per the company's normal requisition process. And they did not dispute that Hudson approached Harris about placing Pooler in the position by way of the PTP. In light of those facts, a reasonable factfinder could not take the mandate issued to Pooler to keep the transfer under wraps far enough to reach the conclusion that the mandate established the existence of a discriminatory cover-up.

Further, taken in conjunction with the overwhelming evidence establishing the PTP's existence and operation in placing Pooler into the job, Harris's admission that he did not consider Travis does not support the finding that discriminatory intent motivated his decision to deny her the promotion. To the contrary, in light of the numerous, uncontroverted evidentiary sources establishing the PTP's existence and its routine operation in filling the position Teal vacated, the only reasonable inference that can be drawn from this admission is that Harris

48

did not consider *anyone* other than Pooler for the job.[21]  No other candidates,

including Travis and the other five or six candidates who applied, were ever

considered, because that was how the PTP worked.  If a candidate identified

through the PTP met the minimum qualifications and passed the interview, he got

the job—hence the term "priority" transfer.

As to the undisputed fact that no female was ever made supervisor at the

PPG site during the time Harris worked there, Travis and the EEOC do not present

any evidence that would lend this testimony any measure of statistical significance.

*See, e.g.*, *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994) (noting

that, "to be relevant,"  evidence of a company's failure to promote black

employees into open management positions would have to be coupled with

"evidence as to how many blacks applied and were rejected and evidence of the

success rate of equally qualified white applicants").  Without such corroboration,

this evidence is merely "anecdotal" and "virtually meaningless."  *See Evans v.*

*McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) (quotations omitted)

---

[21] The Majority places great weight on its determination that "Harris knew about Travis's interest before he ever received Pooler as a PTP candidate or even learned that he would receive a PTP candidate at all." *See* Majority Opinion *supra*.  This, in the Majority's view, would allow a reasonable jury to find "that Harris could have promoted Travis when she approached him about Teal's vacated position, without going through the PTP process at all." *Id.*  But the record does not indicate how much time elapsed between Travis's conversation with Harris about the open position and Harris's receipt of Pooler as a PTP candidate.  So, a factfinder would have to assume without an evidentiary foundation that Harris had time to consider and reject Travis's candidacy before the PTP process began, *and* that his rejection was motivated by bias toward women rather than by simple adherence to the PTP process.  In the face of the evidence concerning the PTP's routine operation presented in this case, I would not hold that this string of suppositions amounted to a reasonable finding.

(quoting *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952–53 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058, 112 S.Ct. 935 (1992)).  Moreover, Travis and the EEOC did not dispute that *no one* was promoted to supervisor in that time frame: Exel's witnesses testified, and Travis and the EEOC did not dispute, that two supervisor positions came open prior to the position at issue in this case, and both of those positions were filled through the PTP.

\*        \*        \*

In sum, Exel faced three options with respect to Pooler's fate.  It could let him walk when the Hawaiian Tropic site closed.[22]  It could cut his pay and demote him to an hourly position, in order to allow Travis to leapfrog him into the supervisor job.  Or it could follow its standard practice and transfer him into the vacant supervisor position at the PPG site—with no changes to his pay or salary classification.  So far as all the evidence presented by both parties indicates, Exel simply chose the latter.

Thus, the factfinder was left with a rather simple evidentiary picture.  Once Harris promoted Teal and filed a job requisition with Corporate HR, he waited. Corporate HR approved the requisition and posted the job.  On-site HR saw the job posting, identified Pooler as an employee on the verge of joblessness due to his site's closure, and presented him to Harris as a PTP candidate.  Harris interviewed

---

[22] Indeed, Pooler was already sitting at home when he got the job at the PPG facility.

him, determined he was minimally qualified, and hired him without considering any other internal or external candidates.  Open and shut.  This series of events was entirely consistent with Exel's well-established and undisputed PTP procedure. What Harris did in this process to act on his alleged bias toward Travis, how he could have done so, or whether he could have done so at all, went unanswered.

As a result, the evidence was insufficient to support the finding that Harris's bias toward women motivated that decision, in whole or in part.  Thus, the District Court should have granted Exel's JMOL motion.

Accordingly, I respectfully dissent.